425 So.2d 67 (1982)
SHELL OIL COMPANY, a Foreign Corporation, Appellant,
v.
Calvin Richard HARRISON and Cindy Baldwin Harrison, Appellees.
Nos. AC-89, AH-170.
District Court of Appeal of Florida, First District.
December 15, 1982.
Rehearing Denied February 1, 1983.
Charles W. Ehrhardt, Tallahassee, Ernest W. Welch of Welch & Munroe, P.A., Tallahassee, and Burt Ballanfant and L. Chris Butler, Litigation Dept., Houston, Tex., for appellant.
C. Douglas Brown of Isler, Brown, Smoak, Harrison & Nabors, Panama City, for appellees.
SHAW, Judge.
This case involves a suit by the Harrisons alleging negligence, strict liability, and breach of an implied warranty by Shell Oil Company and Kerr-McGee Chemical Corporation in manufacturing and marketing a chemical product, "Fasco Nemagon 70EC." The jury returned a detailed special verdict *68 for compensatory and punitive damages against each defendant. In apportioning the responsibility for injury or damage, the jury found Shell responsible for 35%, Kerr-McGee for 60%, and plaintiff Calvin Richard Harrison for 5% of the total compensatory damages of $400,000. Punitive damages of $135,000 were also assessed against each defendant. Thereafter, Shell and Kerr-McGee appealed, but Kerr-McGee later satisfied the judgment against it and withdrew its appeal.
Shell presents numerous points on appeal. We address only the dispositive issue of the duties of a bulk manufacturer or supplier of chemicals to warn manufacturing formulators, retailers, and ultimate users.
Shell was the patent owner, bulk manufacturer, and bulk supplier of a chemical product known as 1, 2-Dibromo-3-Cholopropane (DBCP) which was commonly used as a soil fumigant for many years. Shell marketed DBCP in bulk thirty-gallon steel containers under the trade name Nemagon. As a part of its marketing agreements, Shell furnished Kerr-McGee, and other customers, with a Specimen Label Book and a Shell Formulators Manual. In turn, Kerr-McGee reformulated Nemagon and marketed it for various applications. The particular product involved, containing 70% DBCP and 30% inert ingredients, was packaged in one-gallon glass jugs under the Kerr-McGee trade name Fasco Nemagon 70EC. The label stated that the product was manufactured by Kerr-McGee, but also stated that Nemagon was a Shell registered trademark. Kerr-McGee marketed Fasco Nemagon 70EC through retail dealers in Florida and other states. Among other applications, the product was used against nematodes, microscopic root worms which attack lawns.
During the 1960's and 1970's, concern arose over the possible harmful effects of manufacturing and using Nemagon and, of particular interest here, its use or storage in or around the home. In 1972, as required under federal law, Kerr-McGee submitted a proposed label for a Nemagon formulation to the Environmental Protection Agency (EPA) for approval. The EPA questioned the adequacy of the label, and a triangular exchange of letters ensued between the EPA, Kerr-McGee, and Shell concerning the use and storage of Nemagon products in or around the home. In this exchange, the EPA pointed out that products containing more than 20% Nemagon should not be used in or around the home, that containers of less than one gallon were considered to be for the home market, and that Shell placed labels warning against use or storage in or around the home on five-gallon containers of Nemagon products containing more than 20% Nemagon. Thereafter, on its thirty-gallon containers, the Shell label included the warning "not for use or storage in or around the home."
The concern over the possible harmful effects of Nemagon deepened during the 1970's and, on 24 August 1977, Shell informed Kerr-McGee and other Shell customers by letter of recent developments concerning Nemagon. This letter stated that Shell had suspended manufacture and distribution of Nemagon, and recommended that further sales, reformulation, and shipment of the product be suspended and that Nemagon not be used pending further information. The letter also stated that it was imperative that employees and customers be notified of this information and of Shell's recommendations. In a press release the same week, Shell announced its previous actions and stated that it would ask its distributors to return their Nemagon stock and to assist in the return of products in the hands of dealers and growers. By follow-up letter dated 31 August 1977, Shell requested that Kerr-McGee notify its employees and customers as soon as possible of this new information, that Kerr-McGee return field inventories of Nemagon to Shell, and that Kerr-McGee contact its customers, including dealers and growers, to urge that they return stock on hand.
Charles Baldwin, appellees' father and father-in-law, purchased three one-gallon glass jars of Fasco Nemagon 70EC from a Panama City lawn and garden shop in February, 1974. Baldwin used one and perhaps part of another container of this product on *69 his lawn. The remaining two containers were stored by Baldwin at his home until approximately 31 December 1979. At that time, Baldwin moved to central Florida and gave the two containers of Fasco Nemagon 70EC to Calvin Richard Harrison, who stored the two glass containers on a top shelf in his garage. On 15 January 1980, one of the containers fell to the floor and broke, spilling the contents. The Harrisons consulted the label of the remaining container for directions, picked up the broken glass, and attempted to wash the Nemagon out of the garage with water, using a garden hose. They continued this cleanup for about four hours, in the process inhaling vapors and wetting their feet, legs, and clothing. Because of the strong smell which permeated the house, the Harrisons and their minor children left and, as of the time of the trial, had not returned.
We turn now to the issue of the duty of the bulk supplier of Nemagon (Shell) to the ultimate user of Fasco Nemagon 70EC (the Harrisons). In Zunck v. Gulf Oil Corp., 224 So.2d 386 (Fla. 1st DCA 1969), a home user of liquid petroleum gas suffered injury from a gas leak and explosion, allegedly because the gas had not been impregnated with sufficient odor to warn of the leakage. The gas manufacturer, Gulf Oil, marketed the gas through a wholesale distributor, to a retail distributor, and to the ultimate user. It was shown that the retail distributor knew that the gas was odorless when received from the wholesale distributor, but purchased odorant from the wholesale distributor and used a mechanical device to insert the odorant into the gas in order to provide the requisite warning to the consumers. On these facts, this Court upheld final summary judgments for the gas manufacturer and wholesale distributor because they had fulfilled their duty to warn and, absent a showing that they had not taken necessary precautions commensurate with the dangers reasonably anticipated under the circumstances, they were not responsible for warning the ultimate users of the gas. On the facts and circumstances here, we find Zunck to be dispositive and hold that the trial court erred in not directing a verdict for Shell prior to submission to the jury. We note also that the error in failing to direct a verdict was compounded by the court's refusal to give defendant Shell's requested jury instruction on the duty of a manufacturer or bulk supplier to a manufacturing formulator, to a retailer, and to an ultimate user. Without these instructions on the substantive law, the jury was ill-equipped to determine the duties and responsibilities of Shell to the Harrisons.
Appellees urge on appeal that there was evidence showing that Shell had concealed from, or failed to reveal to, Kerr-McGee information concerning the hazards of Nemagon, its proper use and storage, and precautions to be taken should spillage occur. The facts refute this argument. There was testimony from a responsible Kerr-McGee official that Kerr-McGee knew of the restrictions on the use or storage of Nemagon products in or around the home as of 1972, two years before the product containers in question were bought by Baldwin. There was also evidence of the recall of Nemagon products issued by Shell to Kerr-McGee in 1977, two years before the spill occurred in the Harrisons' home. Under these circumstances, it is clear that Shell took the necessary precautions commensurate with the dangers reasonably anticipated.
Appellees also urge that Shell, the manufacturer or distributor of an inherently dangerous commodity, had a duty to the ultimate foreseeable user to give fair and adequate warning of its dangerous potentialities, including any necessary respirators or protective clothing needed. See Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla. 1958); Lollie v. General Motors Corp., 407 So.2d 613 (Fla. 1st DCA 1981); and Edwards v. California Chemical Co., 245 So.2d 259 (Fla. 4th DCA 1971). Each of these cases is factually distinguishable from the present case. In Tampa Drug Co., the defendant was manufacturer, distributor, and, so far as can be gathered from the facts given, the retailer of the inherently dangerous commodity. Further, the label on the commodity, the adequacy of which was at issue, was *70 also prepared by the defendant. In Lollie, there was no inherently dangerous instrumentality, and defendant General Motors was both manufacturer and distributor of the instrumentality. In Edwards, the defendant manufacturer packaged and labeled the inherently dangerous commodity and marketed it through retailers in the original package with the manufacturer's label attached. The court held that the adequacy of the manufacturer's label presented a question of fact for the jury which precluded summary judgment. All of these cases are factually dissimilar to the present case and none present the legal issue involved here.
Under the facts as detailed above, did Shell, as the manufacturer and bulk supplier of a dangeorus toxic component, have a nondelegable duty to warn ultimate users of the hazards of commodities containing the toxic component when the commodities were formulated, packaged, labeled, and distributed by others? We think not. The federal regulatory system provides for EPA approval and oversight of the labeling and packaging of chemical formulations prepared for sale to the public. These labeling and packaging requirements necessarily differ depending upon the particular formulation and, thus, place the responsibility on the formulator for providing adequate warning to the public and for obtaining EPA approval. Shell, as the manufacturer or supplier selling in bulk to one other than an ultimate consumer, took the necessary precautions commensurate with the dangers reasonably anticipated under the circumstances.
REVERSED and REMANDED with directions to enter a directed verdict for Shell Oil Company.
SHIVERS and WIGGINTON, JJ., concur.